# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO.: 1:19-CR-580 |
| ) | |
| Plaintiff, ) | JUDGE DONALD C. NUGENT |
| ) | |
| v. ) | |
| ) | |
| ROBERT BERMAN, ) | <u>RESPONSE IN OPPOSITION TO</u> |
| ) | <u>DEFENDANT'S MOTION TO REDUCE</u> |
| Defendant. ) | <u>SENTENCE UNDER 18 U.S.C. §</u> |
| ) | <u>3582(c)(1)(A)(i)</u> |

Now comes the United States of America, by and through counsel, Bridget M. Brennan, Acting United States Attorney, and Brian S. Deckert, Assistant United States Attorney, and hereby responds in opposition to Defendant's Motion to Reduce Sentence under 18 U.S.C. § 3582(c)(1)(A)(i).

Defendant Robert Berman seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given that the defendant declined a vaccination against COVID-19. Further, the fact that he does not present a medical condition that, according to CDC guidance, places him at enhanced risk during the current pandemic. Finally, the danger that the defendant presents to the community, the time remaining on his sentence, and all other considerations under 18 U.S.C. § 3553(a).

## I.  Background

### A.  Criminal Conduct

On September 3, 2019, Special Agents from Homeland Security Investigations (HSI) Cleveland, Ohio responded to the area of West 130th and Brookpark Road, Cleveland, Ohio to

assist HSI Columbus, Ohio with the surveillance of a Columbus based subject suspected of distributing narcotics.

During this surveillance, the suspect entered the Life Storage facility, located on W. 130th Street in Cleveland, Ohio. Agents observed the suspect's vehicle parked tailgate to tailgate with a Budget rental box truck. Agents observed an exchange between the occupant of the box truck later identified as Robert Berman and the suspect. After the exchange, the suspect departed the area. HSI Cleveland maintained surveillance on the box truck still parked in the Life Storage facility.

Agents observed Berman load boxes from the box truck to a storage unit in the Life Storage facility. Agents observed Berman meet with a red Dodge Ram. The occupants of Dodge Ram, later identified as Dakota Walters and Salim Womack, loaded several boxes that they received from Berman into the bed of the pickup truck and departed. Agents maintained surveillance on the both the box truck and the red Dodge Ram. As the red Dodge Ram travelled east down Brookpark Road, two marked Cuyahoga County Sheriff's Vehicles approached the Ram from behind. The red Dodge Ram abruptly moved to the turn lane to enter the Home Depot parking lot. Agents and officers conducted an investigative stop where a sheriff's canine alerted to the presence of a narcotic odor in the red Dodge Ram. A search of the Ram revealed approximately fifteen (15) boxes containing THC vape cartridges. The occupants of the red Dodge Ram, Dakota Walters and Salim Womack, were arrested for possession with the intent to distribute a controlled substance and conspiracy to possess a controlled substance with the intent to distribute.

Agents, still surveilling the Life Storage facility, observed Berman meet with an individual driving a grey Dodge minivan, later identified as Todd Brown Jr. Agents observed an

exchange between Berman and Brown. As both the grey Dodge minivan and the Budget rental box truck departed the Life Storage facility, agents conducted an investigative stop of both vehicles. Agents recovered approximately twenty-one (21) boxes of suspected marijuana plants, edibles, and THC vape pens from the grey minivan. Agents arrested Brown for possession with the intent to distribute a controlled substance and conspiracy to possess a controlled substance with the intent to distribute.

The search of the Budget rental box truck resulted in the seizure of two (2) bags of bundled U.S. Currency, totaling an amount of $211,755. Berman was arrested for conspiracy to possess a controlled substance with the intent to distribute. A sheriff's canine alerted to the presence of a narcotic odor from the storage unit that Berman was previously observed entering. Agents seized approximately forty-three (43) boxes of suspected marijuana from the storage unit.

Laboratory testing of the seized material revealed 313.6 kilograms of marijuana and 35,610 THC vape cartridges. The total converted weight of all controlled substances attributable to Berman was 4,816 kilograms.

Berman was charged with Conspiracy to Possess with the Intent to Distribute and Distribute Controlled Substances in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B), and (b)(1)(C); and Possession with the Intent to Distribute Controlled Substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), and (b)(1)(C). Berman entered a plea of guilty to the indictment pursuant to a plea agreement and following a complete and thorough pre-sentence investigative report, his guideline range was 70-87 months (OL27/CHC I).

The Court sentenced Berman to 72 months.

The defendant is serving his sentence at USP Lompoc, with an anticipated release date of May 17, 2026. He has served approximately 2 months and has credit for good conduct time of

approximately 0 months, for total time served of approximately 2 months. (See Exhibit A, Inmate Profile). He has not committed any disciplinary infractions during his time in custody.

B. **Request for Compassionate Release**

On May 7, 2021, the defendant allegedly submitted a request for compassionate release to the warden. The government has requested documents from BOP to verify this information; however, as of the date of this filing BOP has yet to provide any documentation. If Defendant filed a request for compassionate release with the warden, the government would agree that more than 30 days have passed, and therefore has satisfied the administrative exhaustion requirement set forth in 18 U.S.C. § 3582(c)(1)(A). However, the government is reserving its objection on this issue should BOP respond with documentation.

The undersigned did obtain the defendant's medical records for the past year from BOP, which are filed under seal as Exhibit B. The records reveal that the defendant, who is 35 years old, presents no medical issues and does not have tuberculosis as alleged in his motion. (See Exhibit B, pp. 1, 22).

C. **BOP's Response to the COVID-19 Pandemic**

As the Court is aware, from the moment the pandemic began, the Bureau of Prisons (BOP) made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue.

The government recognizes that the COVID-19 case rate at a particular institution may change at any time. We therefore focus primarily on considerations specific to the defendant. But BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences.[1] This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population, which was approximately 170,000 at the beginning of the pandemic, is now more than 10% lower, at the lowest level in decades.

---

[1] This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review); *see also, e.g.*, *United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.); *United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

All of these strenuous efforts have been fruitful. To be sure, there is no way to stop this virus short of widespread vaccination, and inmates inevitably will be infected, and some may succumb, just as in the population at large. But it is notable that the rate of deaths in federal prisons as a whole has been lower than that in the general U.S. population, a notable achievement given the known risks of viral spread in a congregate prison setting.[2] Further, the incidence of positive cases in all BOP institutions has been sharply declining for months, with nearly all institutions currently reporting no cases or case tallies in the single digits.

Specifically, as it relates to the defendant, BOP's aggressive efforts have extended to UPS Lompoc. That institution houses 1,067 inmates. At present, there are 0 inmates who are reported positive. There are also 186 current inmates who previously tested positive and have recovered. There have been 2 COVID-related deaths at this institution. The latest statistics are available at www.bop.gov/coronavirus.

---

[2] According to the U.S. Census Bureau, the estimated resident adult population of the United States (age 18 and over) on July 1, 2019, was 255,200,373. *See* https://www.census.gov/data/tables/time-series/demo/popest/2010s-national-detail.html. As of May 30, 2021, there have been approximately 591,000 adult deaths in the United States from COVID-19. *See* https://covid.cdc.gov/covid-data-tracker/#datatracker-home (there have been fewer than 300 deaths of persons under age 18, *see* https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#SexAndAge, and we subtract that sum from the national total). The estimated number of adult deaths is thus approximately 0.232% of the pre-pandemic adult population. According to BOP, the average population of BOP-managed institutions and community-based facilities in March 2020 was 157,756. As of May 30, 2021, there have been 237 COVID-related deaths in those facilities, which is 0.150% of the March 2020 average population, that is, approximately 35% below the national rate. In asserting that the BOP experience has been relatively worse than the national experience, defendants have cited studies from much earlier time periods in the pandemic, since which time the national mortality numbers steadily and sadly increased at a more dramatic rate.

### D. Vaccinations

BOP is working with the CDC and the federal government's COVID-19 Vaccine/Therapeutics Operation (formerly known as Operation Warp Speed) to ensure that BOP receives the COVID-19 vaccine as it becomes available. As of the week of June 14, 2021, 193,220 doses of the vaccine had been delivered to the institutions.

BOP offered the vaccine first to full-time staff because staff members—who come and go between the facility and the community—present a more likely vector for COVID-19 transmission into an institution. As of this time, vaccines have been administered to all willing staff members, and BOP continues to encourage staff members who have not accepted a vaccine to do so. (Staff members may also obtain and have obtained vaccinations from other providers in the community.)

BOP is now in the process of offering vaccines to inmates, proceeding based on priority of need in accordance with CDC guidelines. In general, the vaccine is offered first to inmates over 75 years of age; then to inmates over 65 years of age; then to inmates of any age who present a condition identified by the CDC as presenting a risk of severe COVID-19 disease; and then to all inmates. As of this time, BOP has administered a total of 193,877 doses to staff and inmates nationwide. As a court recently observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) (footnote omitted).

At USP Lompoc, where the defendant is held, BOP has fully vaccinated 226 staff members, and 1,181 inmates. The defendant was offered the Pfizer vaccine, and he refused it. (See Exhibit B, pp. 28, 41).

The clinical guidance provided to BOP health services professionals is available at https://www.bop.gov/resources/pdfs/covid19_vaccine_guidance_20210311.pdf. The latest information on BOP's vaccination efforts, including the number of completed vaccinations at each institution, is available at https://www.bop.gov/coronavirus/, and is updated every weekday.

**II.  Discussion**

   **A.  Governing Law**

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

> (c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—
>
> (1)  in any case—
>
> (A)  the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i)  extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence

reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."[3]

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Although the Sixth Circuit has concluded that this policy statement is not currently binding in connection with motions filed by defendants, *see United States v. Elias,* 984 F.3d 516 (6th Cir. 2021), the courts of appeals have recognized that it continues to provide important "guideposts," *United States v. McGee*, 992 F.3d 1035, 1045 (10th Cir. 2021); *see United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021) ("Although not dispositive, the commentary to the United States Sentencing Guidelines ("U.S.S.G.") § 1B1.13 informs our analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release."); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused."); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021). The issue is particularly immaterial where, as here, the motion rests on medical grounds, and the Commission has stated a well-accepted definition of the circumstances that qualify as

---

[3] The inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon v. United States,* 560 U.S. 817, 827-28 (2010) (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under 18 U.S.C. § 3582(c)(2)).

extraordinary. *See United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021) (while the Fourth Circuit holds that "§ 1B1.13 is not applicable to *defendant-filed* motions under § 3582(c)," the court recognizes that "it defines, in the medical context, the same substantive term that applies to *BOP-filed* motions. One might reasonably believe therefore that the term 'extraordinary and compelling reasons' will be defined the same for *defendant-filed* motions.").

In application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)  Medical Condition of the Defendant.—
>
>   (i)  The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>   (ii)  The defendant is—
>
>     (I)  suffering from a serious physical or medical condition,
>
>     (II)  suffering from a serious functional or cognitive impairment, or
>
>     (III)  experiencing deteriorating physical or mental health because of the aging process,
>
>   that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B)  Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

    (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 382 F. Supp. 3d 1185, 1188 (D.N.M. 2019) (Johnson, J.) (citations omitted).

    **B.    COVID-19 and Compassionate Release**

The fact of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit therefore held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) (per curiam) (not precedential) ("[T]he existence of some health risk to

every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."); *see also United States v. Hegyi*, 2020 WL 7090710, at *2 (N.D. Ind. Dec. 4, 2020) (Van Bokkelen, J.) ("the presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release on its own.").

The government acknowledges, however, that an inmate who has not been offered a vaccine, who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), as, due to his condition, the defendant may be less able to protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, 2020 WL 3969778, at *5-6 (E.D. Pa. July 14, 2020) (Slomsky, J.) ("a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held" (quoting *United States v. Somerville*, 463 F. Supp. 3d 585, 597 (W.D. Pa. 2020) (Ranjan, J.)). *See also United States v. Elias*, 984 F.3d 516, 521 (6th Cir. 2021) (affirming denial of compassionate release and observing that "the district court properly considered the CDC guidance that was in effect at the time . . . . Relying on official guidelines from the CDC is a common practice in assessing compassionate-release motions.").

The CDC's list of risk factors was most recently updated on March 29, 2021. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

conditions.html. It reports a list of conditions that "can make you more likely to get severely ill from COVID-19." An inmate who has not been offered a vaccine, who presents a condition on that list, presents an "extraordinary and compelling reason" allowing consideration of compassionate release.[4]

### C. The Defendant's Circumstances

Here, the defendant is not eligible for compassionate release because he has not identified any condition that he currently has that is on the CDC's list of risk factors, or indeed any chronic medical ailment. The defendant claims that he has tuberculosis, however, his BOP medical records do not show that. (See Exhibit B, pp. 1, 22). The motion should therefore be denied.

---

[4] Before March 29, 2021, the CDC presented two separate lists of conditions that either definitively entailed a greater risk of severe illness or "might" entail a greater risk of severe illness. Those "might" conditions were asthma (moderate-to-severe); cerebrovascular disease; cystic fibrosis; hypertension; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; overweight; pulmonary fibrosis; thalassemia; and type 1 diabetes mellitus. At that time, the government maintained—and most courts agreed—that inmates with conditions on the "might" list did not present an extraordinary basis for relief. *See, e.g.*, *United States v. Durham*, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020) (Cogburn, J.); *United States v. Moldover*, 2020 WL 6731111, at *9 (E.D. Pa. Nov. 13, 2020) (Slomsky, J.) ("District courts have routinely denied motions for compassionate release based on allegations of only potential COVID-19 risk factors, including asthma and hypertension.").

In the March 29 revision, the CDC merged the two lists without extensive explanation. The CDC also presents a page with information for healthcare providers, which discusses the evidentiary basis for designating each risk factor and indicates that there remains less extensive support for drawing conclusions regarding most conditions formerly listed as "might" factors. *See* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html. The government nevertheless continues to follow CDC guidance and therefore relies on the CDC's expanded list to define what constitutes an "extraordinary and compelling" basis for consideration of compassionate release of an inmate who has not been offered a vaccine.

It also bears noting that although age is not listed as a separate risk factor, the CDC has emphasized that it is an important indicator of risk. The CDC page regarding risk factors, updated on March 29, 2021, states: "More than 80% of COVID-19 deaths occur in people over age 65, and more than 95% of COVID-19 deaths occur in people older than 45."

*See, e.g.*, *United States v. Williams*, 2020 WL 4001045, at *2 (E.D. Pa. July 14, 2020) (Bartle, J.) (denied for inmate who presents no health conditions); *United States v. Cato*, 2020 WL 4193055, at *2 (E.D. Pa. July 21, 2020) (Beetlestone, J.) (same); *United States v. Moore*, 2020 WL 4193012, at *1 (E.D. Pa. July 21, 2020) (Pappert, J.) (same); *United States v. Ramirez-Ortega*, 2020 WL 4805356, at *2 (E.D. Pa. Aug. 18, 2020) (DuBois, J.) (same); *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (Drain, J.) (denied for 28-year-old inmate at institution with outbreak); *United States v. Haney*, 454 F. Supp. 3d 316 (S.D.N.Y. Apr. 13, 2020) (Rakoff, J.) (denied for 61-year-old with no other conditions).

Moreover, the defendant was offered the Pfizer vaccine, and he refused it. (See Exhibit B, pp. 28, 41). That similarly precludes eligibility for compassionate release. *See, e.g.*, *United States v. Baeza-Vargas*, 2021 WL 1250349, at *2-3 (D. Ariz. Apr. 5, 2021) (Teilborg, J.) ("Judges of this Court, as well as others around the country, have ruled with consistency that an inmate's denial of a COVID-19 vaccination weighs against a finding of extraordinary and compelling circumstances.") (citing more than a dozen cases).

As a result, the defendant's motion for compassionate release should be denied. As the government has explained, the pertinent guideline policy statement treats as an "extraordinary and compelling" circumstance "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 app. note 1(A)(ii). The government during the pandemic has acknowledged that an unvaccinated inmate who presents a medical risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19, and who is not expected to recover from that condition, presents an extraordinary and compelling circumstance under that provision.

For all of these reasons, compassionate release is not warranted here. Further, even if the defendant were at elevated medical risk, relief should be denied. This Court must then consider all pertinent circumstances, including the 3553(a) factors, and possible danger to the community. *See United States v. Doe*, 833 F. App'x 366 (3d Cir. 2020) (per curiam) (not precedential) (summarily affirming the denial of compassionate release, in a case in which the defendant presented medical risk, upon holding that the district court did not abuse its discretion in considering the nature of the offense, the defendant's history, and the status of the virus at the facility); *United States v. Bullock*, 833 F. App'x 934 (3d Cir. 2021) (per curiam) (not precedential) (granting motion for summary affirmance of denial of compassionate release, as the district court did not abuse its discretion in denying relief for medically vulnerable inmate upon considering the 3553(a) factors, including the substantial time remaining to be served on the sentence and the defendant's criminal history and institutional infractions).

At present, these considerations—including the defendant's risk of danger to the community, his refusal to accept vaccination, and BOP's strenuous efforts to protect inmates against the spread of COVID-19—counsel strongly against relief.

The defendant continues to present a danger to the community and should be required to serve the sentence that this Court imposed for his criminal conduct. The defendant participated in a conspiracy involving the interstate transportation and distribution of large amounts of controlled substances from California to Ohio and involved large amounts of money. There is no doubt that at the time of his offense, the defendant was engaged in prohibited conduct that presented a significant danger to the community.

The defendant fails to demonstrate how release, 2 months into a 72-month sentence for a serious drug crime, reflects the seriousness of the offense, promotes respect for the law, and

provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). A consideration of the factors above shows that release at this point is inappropriate based on the offense of conviction, the defendant's non-existent medical condition, and the amount of time remaining on the defendant's sentence.

To date, courts have generally granted compassionate release where the inmate suffers from significant ailments that specifically raise the risk of an adverse outcome from COVID-19, is serving a short sentence or has served most of a lengthier one, does not present a danger to the community, and/or is held at a facility where a notable outbreak has occurred. A court summarized: "The common features of the recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic are either (1) properly exhausted claims that unreasonably were refused despite the existence of severe, chronic, or terminal conditions that could warrant release even in the absence of a pandemic, or (2) in cases where the defendants had severe medical conditions that placed them at high risk of coronavirus complications, were housed at a facility with confirmed cases, and had served a large majority of their sentences." *United States v. Ball*, 2020 WL 4816197, at *6 (E.D. Mich. Aug. 19, 2020) (Lawson, J.).

Courts have generally denied release in circumstances comparable to those presented here, even before the advent of widespread vaccination. Courts have generally denied release in cases involving comparable crimes and sentences, even where, unlike here, the defendant presents a health risk that materially increases the risk of a severe outcome due to COVID-19. *See, e.g., United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020) (defendant has served 10 years of 25-year term for drug and witness tampering offenses; suffers from a blood disorder that caused strokes and partial paralysis, as well as "heart problems, high blood pressure, high

cholesterol, and blood clots"; the district court did not abuse its discretion in denying relief, based on the fact that the defendant had not served half his sentence, the original sentence included a 5-year downward variance, he committed serious offenses while suffering from the same conditions, and he had a record of drug and weapons offenses)

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

III. CONCLUSION

For all of the foregoing reasons, the defendant has failed to present extraordinary and compelling reasons for compassionate release and the 3553(a) factors weigh against his release, and therefore his motion should be denied.

Respectfully submitted,

BRIDGET M. BRENNAN
Acting United States Attorney

By: /s/ Brian S. Deckert
Brian S. Deckert (OH: 0071220)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3873
(216) 522-8355 (facsimile)
Brian.Deckert@usdoj.gov
